1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT TACOMA

_____

HANA HAQUE,                        )
                                   )  3:19-cv-05417-BHS
              Plaintiff,           )  Tacoma, Washington
                                   )
v.                                 )  September 13, 2021
                                   )
NATIONAL RAILROAD PASSENGER        )  Pretrial
CORPORATION d/b/a AMTRAK,          )  Conference
                                   )
              Defendants.          )  2:30 p.m.
                                   )
_____

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE BENJAMIN H. SETTLE
UNITED STATES DISTRICT JUDGE
_____

Proceedings stenographically reported and transcript
produced with computer-aided technology

```
 1
 2                         APPEARANCES
 3

 4    For the Plaintiff:      SCOTT H. LEVY
                              ANTHONY S. PETRU
 5                            Hildebrand McLeod & Nelson
                              350 Frank H. Ogawa Plaza
 6                            Suite Fourth Floor
                              Oakland, California
 7
                              KAREN K. OREHOSKI
 8                            Breneman Grube Orehoski PLLC
                              1200 Fifth Avenue
 9                            Suite 625
                              Seattle, Washington
10

11    For the Defendant:      ANDREW G. YATES
                              Lane Powell PC
12                            1420 Fifth Avenue
                              Suite 4200
13                            Seattle, Washington

14                            JOHN A. BONVENTRE
                              MARK S. LANDMAN
15                            Landman Corsi Ballaine & Ford
                              120 Broadway
16                            13th Floor
                              New York, New York
17

18

19

20

21

22

23

24

25
```

```
 1                                  AFTERNOON SESSION

 2                                  SEPTEMBER 13, 2021

 3          THE CLERK:  Hana Haque versus Amtrak, Cause No.

 4   19-05417-BHS.

 5       Counsel, please make an appearance.

 6          MR. LEVY:  Scott Levy on behalf of the plaintiff,

 7   Hana Haque.  Good afternoon, Your Honor.

 8          MS. OREHOSKI: Karen Orehoski on behalf of the

 9   plaintiff.

10          MR. YATES:  Andrew Yates for Defendant Amtrak,

11   Your Honor.

12          THE COURT:  Good afternoon, everyone.

13       As I think you know when you are observing the newest

14   general order concerning COVID entered by Chief Judge

15   Martinez, it indicates that even if vaccinated, masks are

16   required in the courtroom except when speaking.  Because I

17   interact in some hearings, especially this kind, I have this

18   plexiglass up here and I am vaccinated, I will have my mask

19   off.

20       I want to begin this pretrial conference by going over the

21   motions in limine.  I will begin with Plaintiff Haque.  We

22   have had discussion in chambers as to whether it is Haque or

23   Haque.  I guess that has been resolved.  It is Haque,

24   correct?

25          MR. LEVY:  My understanding is it is "hawk" like --
```

1          THE COURT:  I don't think that was offered as an

2     alternative.  I was following the rule from grade school that

3     if the vowel is followed within two letters of another vowel,

4     then it is long.  I will have it right, Haque.

5          The first one is to exclude evidence not produced in

6     discovery.  This, of course, is a general rule.  The Court

7     will reserve ruling on this, depending on the facts and

8     circumstances during the trial.

9          The parties are directed to provide, on the eve of each

10    trial day, the witnesses and documents that the proposing

11    party intends to put into evidence.  Any objection based upon

12    the fact the evidence was not produced in discovery shall be

13    made and the argument taken before such evidence is offered.

14         No. 2, to exclude expert testimony not previously

15    disclosed.  This is stipulated to and granted.  Applies, of

16    course, to both parties.

17         Exclude reference to collateral sources.  It is my

18    understanding that all medical bills submitted to Amtrak have

19    been paid.  Amtrak may inform the jury of this fact.

20         Now, I make that statement.  I am not confident that all

21    medical bills have been paid.  This crops up as an issue

22    again later on.  I would like to understand where we are with

23    respect to that.  I have had, of course, a couple of other

24    Amtrak cases in which all medical bills were paid, and the

25    jury was informed as to the extent of medical bills and that

1   they were paid so those things could be factored in, in

2   arriving at damages.

3      Where are we?  Are there some outstanding medical bills

4   that are controverted?

5          MR. LEVY:  Your Honor, may I be heard?

6          THE COURT:  Yes.

7          MR. LEVY:  The plaintiff -- there is a mistake in the

8   pretrial order.  Plaintiff has decided that they are no

9   longer seeking damages for past medical bills.

10      As to your original question as to whether all of the

11   bills had been paid by Amtrak, I don't think they all have.

12      In any event, plaintiff is no longer pursuing the past

13   medical damages.  As a result, our position is that any

14   reference to Amtrak paying those bills or offering to pay

15   those bills is not relevant to any issue in this case any

16   more and would only be prejudicial.  Plaintiff's view would

17   be to ask the Court to preclude any mention of Amtrak

18   offering to pay or paying any medical bills.

19          THE COURT:  Mr. Yates.

20          MR. YATES:  Your Honor, we have been working this out

21   with Mr. Levy.  I don't think at this point we intend to

22   offer that we paid past medical specials.  The one caveat to

23   that, if I heard Mr. Levy correctly when we were talking

24   before, they may intend to offer some recent past medical

25   bills that have not been presented to Amtrak to try to

1  establish the reasonable value of future medical care. We do

2  have a number of objections to that.  I don't know if the

3  Court would like to hear argument on that now or at a

4  different point.

5       THE COURT:  Let's go ahead and hear that now.  I

6  don't want this to crop up during the trial, this issue about

7  paying medical bills.  It was my understanding that there

8  would be some mention of medical bills have all been resolved

9  of some kind or another so the jury is not wondering or

10 thinking about and they wouldn't have instructions about

11 medical bills, but when arriving at damages and people are

12 talking about future medical bills and so forth, I think

13 there is a peril that they could confuse all that information

14 and think they have to make some sort of award for special

15 damages as part of the general damages.

16   I don't see how it is prejudicial to either side.  Just

17 makes clarification that past incurred medical bills are not

18 being sought, at least some sort of information to the jury

19 on that basis.

20      MR. YATES:  We think some instruction to the jury

21 along those lines would be appropriate.

22      MR. LEVY:  That is fine with plaintiff, Your Honor.

23      THE COURT:  Then with respect to future medical

24 bills, there is an issue there?

25      MR. YATES:  Yes.  So my understanding, Your Honor,

1    plaintiff has recently resumed care --

2         THE COURT:  By the way, you can remove the mask if

3    you like.  It is optional.

4         MR. YATES:  I would prefer to do so.  I am fully

5    vaccinated and have been for some time.

6         THE COURT:  You can remove while addressing the

7    Court.  It is easier to hear.

8         MR. YATES:  I have been told that the plaintiff

9    intends to offer some billing from a recent mental health

10   counselor as part of their effort to establish the reasonable

11   value of what they think are future medical care.

12     We have a number of objections to this.  The first one is

13   plaintiff has testified herself that she doesn't need any

14   more medical treatment.  No future care is within the charts

15   of anybody that she has seen, so it can't be supported for

16   that reason.  They don't have a life care planner or an

17   economist that could put a value on those services and then

18   reduce them to present value for services that are going to

19   extend out over time. For simple lack of evidentiary support,

20   they simply shouldn't be allowed in this case.

21        MR. LEVY:  Your Honor, Amtrak is correct.  The

22   plaintiff is seeking the reasonable value of future medical

23   care.

24     The plaintiff is currently in mental health treatment.

25   She is seeing a therapist on an ongoing, weekly basis.

1      Our expectation is there will be testimony at trial to

2  support ongoing future medical care related to her mental

3  health.  That is why we do seek to admit the bills for

4  Mr. Barone, who is her current mental health treater, and

5  have him discuss the bills and discuss whether it be

6  reasonably necessary for her to get mental health treatment

7  in the future.

8          THE COURT:  So you are going to make a request for

9  medical bills as relates to these?  Not just future, but

10  present?

11          MR. LEVY:  No, Your Honor.  The plaintiff intends to

12  talk to Mr. Barone and use his billing records as evidence of

13  what the reasonable care -- the reasonable value of care

14  would be in the future.

15          THE COURT:  When did this occur that he produced

16  this?  This is a discovery issue well, is it not?

17          MR. YATES:  It is, Your Honor.  This was all long

18  after the discovery cut off.

19          MR. LEVY:  I don't know if I want to get sidetracked

20  and discuss the issue on discovery cutoff.  Because the

21  plaintiff is still treating, she started seeing this mental

22  health provider in February and is still treating with the

23  provider, right when we got the records about a week and a

24  half ago, we produced those records immediately to Amtrak.

25          THE COURT:  All right.  I have permitted before,

1    Mr. Yates knows this, I permitted before where there has been

2    ongoing continuing treatment to have healthcare providers

3    provide updates.  There is enough time here to take a

4    deposition, Mr. Yates, if you need to, of this additional

5    information.

6           MR. YATES:  Yes.  Your Honor, it is not so much an

7    issue of ongoing medical care.  If she is seeing this

8    treater, she's seeing this treater.  It is that we didn't

9    know it was -- that they were going to use past bills to try

10   to establish future bills.  It is sort of an evidentiary and

11   discovery issue.  There is no foundational support for it

12   because she herself has testified she doesn't need any more

13   treatment and they don't have somebody who can come in and

14   put a value on this.

15      Mr. Barone is a licensed mental health counselor.  He

16   can't come in and give an opinion about the reasonable value

17   of these bills.

18           THE COURT:  He can give an opinion as to his own

19   bills, whether they are reasonable and medically necessary.

20           MR. YATES:  He can't talk about what she might need

21   from somebody else in the future.

22           THE COURT:  That sounds like a problem, all right.

23           MR. LEVY:  From the plaintiff's perspective, the

24   plaintiff is 22 years old.  At the time she was deposed, she

25   wasn't in mental health treatment.  She's fluctuated, her

1    symptoms have gone and up down since this train accident.  At

2    the current time, she's in mental health treatment, and I

3    think it is appropriate for plaintiff to be allowed to ask

4    the witness -- the treating witness if the plaintiff will

5    need -- if there is a reasonable probability this plaintiff

6    will need future medical care.

7              THE COURT:  From him or someone else?

8              MR. LEVY:  Him.

9              THE COURT:  We are talking about his own medical

10   bills?

11             MR. YATES:  This is the first I am hearing of that.

12   If so, that may be the case.  The way it has been represented

13   to us prior is that it is sort of a nebulous, she's going to

14   need future mental health care and I think it is going to

15   cost this much.  He can't say what a psychologist or

16   psychiatrist or neuropsychiatrist or speech language

17   pathologist might charge or might do because that is far

18   outside the scope of his expertise.

19             THE COURT:  I think he can testify if these are --

20   again, these are not experts that require the report of a

21   treating physician.  If they form the opinion at the time of

22   treatment -- if he had an opinion she needs to come back and

23   reasonably can project over the next three or four years or

24   whatever he thinks, and he formulated that, and he can talk

25   about what his hourly rate is, I think that is probably the

1  limit of what can be done here.

2          MR. YATES:  We still have the issue they don't have

3  an economist to discount anything too far out in the future.

4          THE COURT:  All right.

5          MR. LEVY:  Can I be heard on that issue?

6          THE COURT:  Yes.

7          MR. LEVY:  We have a proposed jury instruction on

8  this.  I think the Washington panel instructions covered this

9  situation instructing jurors to put everything in present

10  value and referring them to a table that has been produced by

11  the State of Washington Office of Insurance from their

12  website.

13          THE COURT:  How long are we talking about that you

14  are going to be expecting this witness to indicate she needs

15  additional counseling?  How many years?

16          MR. LEVY:  Well --

17          THE COURT:  Months?

18          MR. LEVY:  We would like to ask Mr. Barone that.  I

19  am not sure what Mr. Barone will testify to.

20          THE COURT:  You don't know at this point even?

21          MR. LEVY:  We said in our recent 26(a) disclosure on

22  the damages calculation, we expected the plaintiff to seek

23  therapy every other week for the remainder of her life, which

24  would be 60 years.  Remains to be seen what Mr. Barone will

25  testify to.

1    MR. YATES:  This is the problem, Your Honor.  That

2    kind of thing hasn't been disclosed to us.

3    THE COURT:  That's pretty significant.

4    MR. LEVY:  What hasn't been disclosed?

5    THE COURT:  She's looking at lifelong counseling

6    every other week.  That is a significant bit of new

7    information.

8    MR. LEVY:  Oh, no, this was disclosed to defendant a

9    long time ago.

10    MR. YATES:  It is possible it has been made as a

11    claim.  I haven't seen any evidentiary support for it.  As we

12    have agreed, we just got Mr. Barone's records about a week

13    ago.

14    THE COURT:  You have an obligation to -- continuing

15    obligation under Rule 26 to provide this discovery.  You

16    expected to be able to come in here without ever furnishing

17    them with evidence of lifetime counseling and how much it is

18    going to cost?

19    MR. LEVY:  We have produced the records we got from

20    Dr. Barone (sic) that indicate she needs ongoing weekly

21    therapy.  We then intend to ask Mr. Barone at trial what sort

22    of future medical mental health needs she needs.

23    MR. YATES: He's not qualified to talk about what

24    she's going to need 40, 50, 60 years from now.

25    THE COURT:  I don't know that he is either.  That is

1   a foundation question.  Foundation will have to be laid that

2   he can do that.  It may be a matter of cross-examination.

3   This is rather late in the day to be talking about what could

4   represent tens of thousands of dollars.

5           MR. LEVY:  I understand, Your Honor.

6           MR. YATES:  They have no economist that can reduce it

7   to present value.  Having the jury do that calculation isn't

8   appropriate.  That's why we have economists.

9           THE COURT:  You don't have an economist?

10          MR. LEVY:  I understand.

11          THE COURT:  How are you going to get this in,

12  recognizing that these damages must be discounted to present

13  value?

14          MR. LEVY:  Of course, Your Honor.  Plaintiff's

15  Proposed Exhibit No. 30 -- excuse me, Plaintiff's Exhibit 30

16  is the present value table taken from the Office of the

17  Insurance Commissioner for the State of Washington.  I

18  believe that is a self-authenticating document because it is

19  an official publication of the office.  It tells you exactly

20  what to do.  If you use the present value table, and you use

21  that in addition to the jury instruction that we proposed, I

22  don't think it is necessary to have an economist in this

23  case.

24          THE COURT:  You are going to have to show me

25  authority that that is adequate to submit to the jury for

1    calculation.

2          MR. LEVY:  Okay.  I don't have that off the top of my

3    head, Your Honor.

4          MR. LANDMAN:  Your Honor, I apologize for

5    interrupting.  This is Mark Landman, also counsel for Amtrak.

6    We can cut through this, if I can have a moment to make one

7    point.

8          THE COURT:  I didn't know you were on, Mr. Landman.

9    Good afternoon.

10          MR. LANDMAN:  Good afternoon, Your Honor.  How have

11    you been?

12          THE COURT:  I am fine.  Thank you.  The procedure

13    succeeded.

14          MR. LANDMAN:  Good.  Good.  It is good to hear your

15    voice and everyone getting back in the saddle.

16      Your Honor, just cutting right through this, here is I

17    think the critical point:  There is nothing in Mr. Barone's

18    records that we have been provided that suggest anywhere that

19    Ms. Haque will need 60 years of treatment.  In fact, the only

20    thing in his record is the continuation of treatment will

21    either be for six months or one year from the time he first

22    started treating her in February or March of this year. There

23    has been no disclosure whatsoever to support this.

24      We don't need to get to the issue of economists,

25    discounted present value.  There has been no disclosure by

any person, medical person or even Mr. Barone, that she will need the 60 years of treatment.  That is solely something the plaintiffs put in the disclosure, but we don't have any record from Mr. Barone that says that.  They have no expert disclosure in this case.  There is just no basis whatsoever that we could have been prepared to respond to that.

THE COURT:  Apparently, Ms. Haque herself indicated she's not seeking that, apparently in a deposition?

MR. YATES:  That's true.

MR. PETRU:  Your Honor, allow me to introduce myself. My name is Anthony Petru with Mr. Levy for plaintiff on this matter.

There is a bit of a disconnect here.  I think the evidence will bear out that at the time of her deposition, she wasn't in treatment.  At that time, I think she was a 21-year-old or 20-year-old who, like many young people who are the subject of a traumatic incident like this, don't know what the course is going to be.  It turns out that she, at that time, had just come back from traveling, was not in therapy at that time, but found she needed therapy again.

The testimony will be, and I expect it will be from all the providers, is people who have suffered traumatic incidents like this who have PTSD or a general anxiety disorder associated with a traumatic event will need counseling periodically.  It is in the records.  In fact,

1    from the very early records there is an indication she's to

2    come back on a PRN basis.

3         What we can't do is quantify exactly right now what that

4    frequency is going to be.  That's going to have to be what

5    Mr. Barone testifies to.

6         As the Court indicated, if they want to take his

7    deposition, they can have more detailed information at the

8    time of trial, or I can contact Mr. Barone and find out what

9    he is going to testify to specifically with regard to how

10   frequently in the future.

11        What is clear is she's going to require access to therapy.

12   She is now three and a half, almost four years post-incident

13   and still suffers the sequela and symptoms associated with

14   her exposures.  The probability is that she will continue to

15   have those experiences; when and the frequency she needs

16   therapy is the subject of examination of Mr. Barone.

17             THE COURT:  When was her deposition --

18             MR. LANDMAN:  Your Honor, briefly --

19             THE COURT:  When was her deposition taken?

20             MR. PETRU:  January of 2020.

21             THE COURT:  So we are a year and a half out from

22   that.  There was no -- at that time, she said she was not

23   going to be seeking any future medical assistance.  Yet, you

24   had an obligation, she had an obligation through you to

25   disclose that that information had changed.  They are just

1   learning it a week and a half ago?

2        MR. PETRU:  No.  I'm sorry, Your Honor.  We shared

3   with them that had changed some time ago.  Both plaintiff and

4   defense have had a very difficult time getting Mr. Barone's

5   records.  We got them and shared them with the defense the

6   same day we received them.  They knew she was in therapy and

7   knew she had been in therapy for couple of months now.  I

8   can't give you the exact date.  We didn't sit on it.  We

9   shared it as soon as we knew about it, Your Honor.

10       MR. LANDMAN:  If I can respond very briefly.

11  Mark Landman.

12    I think Mr. Petru's statement itself tells everything we

13  need to know about why this is prejudicial to the defendant

14  because Mr. Petru said, "We can contact Mr. Barone and ask

15  him how long she will need treatment for in the future."

16    If it is not in his records and they don't even know it,

17  how can we possibly know it and prepare for trial in two

18  weeks based upon that?

19       MR. PETRU:  If you don't mind my response directly,

20  Your Honor.  That's not quite what I said.  I said there is a

21  need for access -- there will be a need for access in the

22  future.  I don't have the specific number that he gave us.  I

23  can find out so that counsel can maybe take his deposition.

24    We need to try this case on its facts and merits.  Defense

25  has the right to know this information and they need to know

1  it now, and we will do what we can to get it to them.

2      THE COURT:  The complexion of the case seems to have

3  changed considerably in terms of future medical expenses.

4    I will allow Amtrak to take Barone's deposition at the

5  expense of plaintiff and reserve ruling on this.

6    If Amtrak believes it has been prejudiced unfairly with

7  regard to this issue, it can renew or it can make the motion

8  to strike any testimony concerning future medical expenses.

9      The parties are going to have to do simultaneous briefs on

10  this.  We have a short time, obviously.  I think in COVID

11  time, this can be set up quickly through Zoom, and then

12  followed with simultaneous briefing on the question of

13  whether, after this deposition was taken, Amtrak finds that

14  it has been unfairly prejudiced from which it cannot

15  adequately prepare for trial.

16      MR. LEVY:  Your Honor, if I may. Where would the

17  prejudice be coming from?  Are you talking about from delay?

18      THE COURT:  Prejudice from having -- not having the

19  ability to respond to your information, one.  Two, to develop

20  this question of discounted to present value.

21      MR. LEVY:  Understood.

22      THE COURT:  We are excluding expert testimony not

23  previously disclosed.  We talked about the collateral source

24  rule already.  There is no need to make any reference to

25  collateral sources here.

1       No. 4, exclude reference to time or manner of attorney

2   retention.  This was agreed to by Amtrak, except it may seek

3   to admit evidence of timing to see certain providers in

4   relation to time of hiring an attorney.  This kind of

5   evidence is marginally relevant, but under 403 the propensity

6   to confuse or mislead the jury makes it more unfairly

7   prejudicial than it is probative.  That motion is granted.

8       No. 5 is to exclude reference to location of attorney's

9   law firm.  That's agreed to and granted.

10      No. 6 is exclude reference to tax on discovery.  I have

11  not only allowed this information to be communicated to a

12  jury, but also given an instruction on it.  I received once a

13  juror question about taxability and I answered it consistent

14  with the law.  That is, that the award will not be taxed.

15  That is the law as I understand it presently.  Otherwise, a

16  jury could gross up its calculation to include some

17  speculated amount that will have to be paid and thereby

18  reduce plaintiff's compensation.  That is denied without

19  prejudice.

20      If plaintiff can come and show me in some ways, under some

21  law, state or federal law, that this would be taxable, then

22  you can renew the motion.  Everything that I have been

23  instructed on with regard to taxability is this is not

24  taxable.

25      I think the juror question that I got once is

1   demonstrative of the fact that these are matters that are

2   confusing to a jury.  I don't think they should be

3   speculating about whether their award should take into

4   consideration taxability.

5        Exclude reference to the absence of parties or witnesses.

6   The Court follows the general rule that it is improper to

7   comment on the absence of a witness to allow an inference

8   that such witnesses' testimony would be adverse to the other

9   party where such witness is available to either party to

10  testify.

11       While it can have some arguable relevance in some cases,

12  the unfair prejudice to the other party is outweighed by any

13  probative value.  Plaintiff has the burden of proving her

14  injuries and medical prognosis and treatment.  Failure to

15  call all treatment providers is actually encouraged by the

16  Court where such testimony is cumulative or mostly

17  cumulative.  The motion there is granted.

18       No. 8 is exclude evidence of preexisting conditions.  The

19  Court reserves ruling on this motion.  It is correct that a

20  witness may not speculate.  It is permissible, if in good

21  faith the defense has evidence that some part of her

22  physical, mental or emotional condition today can be tied in

23  part to other events or causes. The Court will reserve ruling

24  on that one.

25       No. 9 is exclude evidence of defendant's good character or

1    other good acts.  That issue was tied up in really the

2    question of paying the medical bills.  We have already

3    discussed that.  The jury should be informed that the medical

4    bills are not an issue in this case and have been paid.

5    Doesn't need to indicate who paid, only that it is not a

6    concern for them.

7        Amtrak's motions begin with, No. 1, exclude evidence of

8    Amtrak's liability.  In previous Dupont derailment cases, the

9    Court has excluded evidence regarding liability.  However, it

10   has also allowed some evidence relevant to emotional and

11   psychological damages that pertain to the speed and force of

12   the derailment as well as a limited number of photos to

13   demonstrate the magnitude of the aftermath of the derailment.

14       Here, plaintiff is expected to testify as to what she

15   observed when she regained consciousness.  That has relevance

16   to her claims for emotional and psychological damages.

17       I am concerned about admitting testimony of an Amtrak

18   employee who will expected to be called to testify.

19       What is relevant here is what plaintiff experienced, not

20   what someone else who had perhaps a similar experience.

21       I will reserve ruling on calling a separate witness, and

22   the admissibility will depend upon the extent to which Amtrak

23   may attempt to attack plaintiff's recall of what she

24   experienced and observed.

25       This other employee of Amtrak, to me, it is just

1    somebody -- it could be anybody else, but I don't see the

2    need for having another witness come and describe the scene.

3            MR. LEVY:  May I be heard, Your Honor?

4            THE COURT:  Yes.

5            MR. LEVY:  The plaintiff, as Mr. Petru described, was

6    18 at the time.  She was knocked unconscious in the passenger

7    car.  When she came to, she noted she was outside on the

8    ground near a hill.  As she made her way to the hill, she was

9    hysterical.  She was not, you know -- it was a highly

10   stressful situation for her.

11       The relevance of Chris Burniger, who was an Amtrak

12   employee, Mr. Burniger was located -- he was sitting on the

13   train in a passenger car behind plaintiff.  At the time of

14   the derailment, he jumped into action and started walking

15   around and helping passengers, surveying the scene and doing

16   what he could to help folks.

17       I think what Burniger will add here is a perspective of

18   somebody who wasn't quite as injured.  I don't believe

19   Mr. Burniger was knocked unconscious.  He also brings the

20   perspective, being an Amtrak employee, he understands the

21   speed of force, how fast the train was going.  He understands

22   some details the plaintiff may not be aware of.

23           THE COURT:  Mr. Yates.

24           MR. YATES:  I believe Mr. Burniger had a shoulder

25   repair surgery.  He was represented by Mr. Petru's firm.

1    There hasn't been any evidence or disclosure or connection

2    between Mr. Burniger and Ms. Haque whatsoever.

3        I think Your Honor correctly identified the problem with

4    this in your tentative ruling, and I would ask that you make

5    that ruling.

6            THE COURT:  She had a friend that was riding with

7    her.  She's expected to be a witness.

8            MR. LEVY:  She's not going to be a witness.

9    Emily Torgeson is her friend.  She was sitting next to Emily

10   at the time of the incident.  Emily is currently in Cairo,

11   Egypt, and she's not going to be testifying in this case.

12       The plaintiff did have a falling out after the trauma, as

13   a lot of trauma survivors who witness the same trauma

14   sometimes happens, they had a falling out and are no longer

15   on speaking terms.

16       As far as the fact witnesses, the lay witnesses who would

17   be able to testify to the scene, we have three on our list, I

18   believe.  We have Kyle Steel, who is another passenger who

19   was on the train who first met Plaintiff Hana at the top of

20   the hill and rode the ambulance together with her.  They

21   maintained a relationship over text message for some time

22   after the derailment. The other witness is Mr. Burniger, who

23   we have discussed, and then Hana would be the third.

24           THE COURT:  I am going to exclude -- how did you

25   pronounce the name?

1          MR. LEVY:  Burniger.

2          THE COURT:  Burniger.  I am going to exclude him.  I

3    think under a 403 analysis, the unfair prejudice of producing

4    an Amtrak employee who was not in the same car, apparently

5    didn't observe her, his only purpose then would be to testify

6    as to what he observed.

7          What is relevant to her psychological injury and damage is

8    what she remembers, what she recalls, and the other witness,

9    who was riding there with her, can certainly -- or was on the

10   hill with her can assist in describing the scene and how she

11   found her and those sorts of things.  That is sufficient.

12   More than that, I believe, is a 403 problem.

13         MR. LEVY:  Okay.

14         MR. YATES:  Your Honor, may I --

15         THE COURT:  Yes.

16         MR. YATES:  Now that it has been confirmed that

17   plaintiff is not calling Ms. Torgeson, I have let Mr. Levy

18   know this, but we may be submitting testimony from her

19   deposition by designation in our case.

20         THE COURT:  All right.  If she's unavailable to

21   testify and you can meet the standard.

22         MR. YATES:  She is in Cairo, Egypt.

23         THE COURT:  The last part of that motion was to

24   exclude reference to Positive Train Control.  That has been

25   agreed to and granted.

1      Second is exclude media reports or return to service.  The

2  Court will reserve ruling on this.  As a general matter, news

3  media accounts, photos and videos are not relevant.  However,

4  a foundation may be laid that plaintiff viewing media reports

5  exacerbated her emotional and psychological damages.  This

6  does not necessarily mean plaintiff's counsel can introduce

7  specific news media videos or reports unless the plaintiff

8  can specifically identify such report as having been seen or

9  read by her and what specific reaction it caused her to have.

10  The Court will have to be presented with such evidence

11  outside the presence of the jury.  You can bring that to the

12  Court's attention in advance, and I will take up any

13  objection to the specific media account reference.

14      No. 3 is exclude reference to congressional intent.  That

15  is agreed to and granted.

16      No. 4, exclude reference to motions in limine.  That's

17  agreed to and therefore granted.

18      No. 5 is exclude evidence not produced in discovery.  I am

19  giving the same ruling it did in plaintiff's motion.  It is

20  granted.

21      No. 6 is exclude reference to discovery orders or issues.

22  That's agreed to and granted.

23      No. 7, exclude reference to Amtrak derailments, crossing

24  collision and other incidents.  This was opposed by plaintiff

25  asserting that something might be offered in this area that

1   affected the plaintiff.  I am skeptical, I must say, and

2   plaintiff will have to indicate, in advance of offering any

3   such evidence, to Amtrak of what it intends to present.

4   There is still a strong chance the Court would exclude it

5   under 403.

6        Can you tell me now, is there some evidence of some other

7   collision, derailment or accident that is relevant directly

8   to her emotional damage?

9        MR. LEVY:  Yes, two different instances, the first

10  one is the plaintiff had a conversation -- had a relationship

11  with somebody named Tiffany Nixon, who was involved in a

12  train accident in South Carolina.  They maintained a

13  relationship and discussed their traumas together, their

14  trauma from the train.

15       The second incident involving a derailment, I believe it

16  occurred someplace in Asia.  This comes up in Mr. Barone's

17  mental health care records of plaintiff.  The focus of

18  therapy that particular day was Hana, the plaintiff, telling

19  Mr. Barone she had seen a news story about this crash in Asia

20  and it retraumatized her and there was a discussion about

21  that.

22       THE COURT:  That didn't involve Amtrak.

23       MR. LEVY:  No, it does not.

24       THE COURT:  I think that will be clear in the

25  testimony.  That is the kind of testimony I am saying I may

1    allow.

2         MR. LEVY:  The South Carolina train accident, I

3    believe, was an Amtrak derailment.  The person,

4    Tiffany Nixon, who was put in contact with plaintiff is

5    somebody that Amtrak provided that information to Hana.  I do

6    think Hana should be able to testify what impact talking to

7    Tiffany, the South Carolina survivor, had on her.

8         MR. YATES:  Your Honor, may I be heard on this?

9         THE COURT:  Yes.

10        MR. YATES:  The context here is when we finally got

11   the Barone records after months and months, we reviewed them

12   and there was references to emails and text exchanges with

13   other train survivors.  We asked in the first set of

14   discovery in this case for exactly such things, any

15   communications, things like that with other people that they

16   have talked to about this stuff.  We heard nothing until less

17   than a week ago about this, when we specifically asked for it

18   and said, hey, looks like there may be something you haven't

19   provided.  They said, we'll look into it and we will get it

20   to you.

21     They have gotten us this, but I have questions about

22   whether there are other things, including texts with

23   Ms. Steel.  It is problematic that this is now being advanced

24   as a claim after we uncovered these communications after the

25   discovery cutoff.

1    THE COURT:  It doesn't sound like to me it is a new

2  claim.  It is all part of the claim and they are representing

3  this as being part of the psychological harm she suffered,

4  that when she has conversation with somebody, like someone

5  else who had a similar experience, it brought all the

6  nightmares back.  That kind of testimony.

7    MR. YATES:  It is a new witness with Ms. Smith -- or

8  the witness they just -- it is a new witness that has never

9  been on their list and identified, and also hearsay and other

10  admissibility problems for those emails.

11    THE COURT:  Are you calling her as a witness or

12  having plaintiff talk about this?  Actually, it is going to

13  come through Barone?

14    MR. LEVY:  The South Carolina accident would come

15  through Hana, the plaintiff.  She would discuss that, her

16  experience talking to the South Carolina survivor.  The

17  second issue would be Hana should be entitled to talk about

18  her retraumatization after she heard the news story about a

19  crash in Asia.

20    THE COURT:  I am going to allow that.  With respect

21  to the South Carolina derailment, it is not hearsay.  What

22  you are talking about there is not being offered for the

23  truth of the matter that this other person had this

24  experience.  Rather, it was plaintiff's response to this

25  information, whether true or not.

1    She can testify concerning that conversation.  Again, I

2    don't think it is excluded under 403.  I don't think it is

3    unfairly prejudicial.  Probably consistent with other

4    triggers that she's talked about.

5    I am going to exclude -- No. 3, exclude reference to

6    congressional intent.  That's agreed to and granted.  I think

7    I covered that.

8    I think I am down to No. 7, exclude reference to Amtrak

9    derailments.  I covered that.

10    No. 8, exclude comparative wealth.  That is agreed to and

11    granted.

12    No. 9 is exclude reference to liability insurance, which

13    is agreed to and granted.

14    No. 10 is exclude reference to NTSB report.  Plaintiff

15    opposes, but does not address relevance.  In what way would

16    the NTSB report be relevant in this case?

17         MR. LEVY:  Your Honor, our view of defendant's motion

18    on the NTSB reports is it is overly broad.  My read of the

19    cases is that the NTSB reports, the conclusions are kept out

20    but the factual part is allowed in, in the *Chevron* case, as

21    well as the *Riggs* case.

22    Amtrak didn't tell us which exhibits they sought to keep

23    out in this.  I have gone through and noted the various

24    exhibits here that are NTSB-produced documents.  I can go

25    through those with you, Your Honor.

1          THE COURT:  Well, what are they?

2          MR. LEVY:  Exhibit 9, for example, is the illustrated

3    accident diagram, which is an overhead picture of the train

4    accident identifying the various car numbers.

5      We think that is particularly relevant because the

6    plaintiff has testified that she was in a car that landed on

7    the dirt and was on its side.

8          THE COURT:  I have indicated I am going to permit

9    some photos or maps, if it is from the NTSB.  You are going

10   to have to work out with Amtrak which ones you want.  I am

11   saying, I am going to limit those because liability is not an

12   issue.  Some photos are going to be relevant to depict the

13   magnitude of this accident as relevant to the emotional and

14   psychological harm that was suffered.  So I expect you to

15   work this out with Amtrak, and if there is still a dispute, I

16   will resolve it.

17         MR. LEVY:  I appreciate that, Your Honor.  There are

18   some documents that are not photographs that I believe are

19   facts that would be relevant and probative in this case as

20   well.  One of them is our Exhibit 21, which is a table.  It

21   is Train 501 characteristics.  What this document is, is it

22   identifies each of the railcars that made up the train that

23   day, sequences them 1 through 14.  It has the bistro car and

24   the dining car as cars 5 and 6.  The first passenger car

25   behind those is Amtrak Car 7504.  That's our understanding

1   from Hana's testimony, from Hana's interview at the hospital,

2   she was located in the car immediately behind the dining and

3   bistro cars.

4       We think it is relevant to have -- we think it is

5   important for the jury to be able to see the table to be able

6   to identify what car she was in.

7       The reason this is so important here is because Car 7504

8   was the most seriously damaged car in that entire train.  All

9   three fatalities came out of that car.  More than 60 percent

10  of the roof compressed.  The survivability in that car was

11  very low.  Most passengers were significantly injured there.

12      We think this document here that shows which car,

13  identifies the cars by car number and sequence, is very

14  probative and helpful in this case.

15          THE COURT:  Again, I am going to let you work with

16  Amtrak.  That sounds like to me the type of evidence, on a

17  limited basis, I am going to permit so the story can be told

18  as to where she was when the derailment occurred, where she

19  ended up and the damage to her car is relevant.

20          MR. LEVY:  Thank you, Your Honor.

21      Before we move on, I want to see if are there any other

22  NTSB-related documents that we haven't covered here, if you

23  don't mind.

24      The only other NTSB document, Your Honor, is Exhibit 24,

25  which is an interview taken of the plaintiff at the hospital,

1    Good Samaritan Hospital by the police department.

2        Our position on that is it is admissible.  We think -- it

3    was taken less than three hours after the accident.  We think

4    it is admissible as an excited utterance.  We think she was

5    still under the impact of that startling event at the time

6    she gave that statement.  She was still in the hospital.  The

7    nexus between her statement and -- the nexus between her

8    statement and the event are very clear.  She was talking

9    exactly about the event and it was clearly a startling event.

10            THE COURT:  Mr. Yates.

11            MR. YATES:  She'll be here to testify.  I don't think

12   that it is admissible on that basis.  It would also need to

13   be reviewed for compliance with the Court's rulings on other

14   motions in limine.

15       As a general matter, I will say, certainly as we have done

16   in the other cases, we will work with the plaintiff and try

17   our best to come to an agreed set of exhibits that go to

18   damages.

19       One of our concerns is, of course, the difference between

20   liability evidence, which is inappropriate for the jury, and

21   argument and questioning is included in that, and evidence

22   that sets the scene, which we obviously understand the Court

23   has ruled is admissible.  We will work with Mr. Levy and his

24   team on this issue.

25            THE COURT:  All right.  I expect you to look at that

1  document as well.  This is a pretty limited request.  It

2  sounds like it would qualify as excited utterance, so work

3  with him on it.

4         MR. YATES:  We will, Your Honor.

5         THE COURT:  Exclude punitive damages, that's agreed

6  to and granted.

7     No. 12, exclude reference to other settlement offers,

8  that's agreed to and granted.

9     Exclude the inflammatory questions, statements and

10  arguments of necessity.  This motion is denied.  The Court

11  will rule on any objection made relating to these concerns

12  when and if they arise.

13     No. 14 is exclude reference to fatalities.  Plaintiff is

14  expected to testify to seeing a deceased man.  This is

15  relevant to her pain and suffering claim.  The Court will

16  defer ruling until testimony is being offered, but will

17  likely rule that it is relevant, not precluded by 403.

18     Other references to fatalities should come in an offer of

19  proof outside the presence of the jury.

20         MR. PETRU:  Your Honor, this is Anthony Petru, if I

21  may interrupt.  With regard to Defense No. 12, that was

22  evidence of other settlements and offers to settle

23  plaintiff's case, there is a concomative issue there where

24  they was some discussion with the therapist about wanting to

25  have the case settled.  I think there is a lot of prejudice

1   that might be evoked in that if it is used incorrectly.  Of

2   course, she would like to have the matter behind her.  I

3   would ask the Court to be aware of that.  There may be some

4   objections with regard to soliciting references in the

5   medical records where she is talking to the therapist about

6   talking to us as her attorneys to try to get the case

7   settled.

8       I am not quite sure whether the Court subsumed any

9   references to any settlement discussion, whether it is with

10   the parties directly or with the therapist.  I would like to

11   have the Court comment on that, if you can.

12          THE COURT:  Were you going to add something?

13          MR. LEVY:  I spoke to Andy about this earlier.  The

14   plaintiff did intend to file a supplementary motion in limine

15   and tell Your Honor that, speaking exactly to what Mr. Petru

16   says, the plaintiff has expressed some feelings about the

17   settlement, her desire to settle, the amount of money she

18   would accept, fear of going to trial.  Things like that, we

19   think are not probative of any of the issues in the case and

20   could be considerably prejudicial.  We ask that the Court

21   keep that out.  We are happy to do a formal motion in limine

22   on that, if you like.

23          THE COURT:  Mr. Yates, do you have any different view

24   of this?

25          MR. YATES:  There is no motion on this before the

 1   Court.  I would say the Court should take this as it comes up

 2   in trial.  Certainly, I think not everything that is being

 3   referenced in the record here would be admissible.  I think

 4   there are other things that would be and should be, depending

 5   on how the evidence comes in.  I think we should leave it

 6   until then.

 7          THE COURT:  Of course, motions in limine are helpful

 8   to the Court to alert the Court to evidentiary issues that

 9   will expect it to arise.  We now expect this could arise.  I

10   want you to work it out and talk with him.  From the

11   description that has been given, sounds like the sort of

12   thing that would be unfairly prejudicial to Amtrak as much as

13   to plaintiff about the desire to settle.

14          MR. YATES:  Thank you, Your Honor.  We will work on

15   this issue.

16          THE COURT:  All right.

17          MR. PETRU:  Thank you, Your Honor.  Appreciate the

18   indulgence.

19          THE COURT:  Moving on to 15, exclude cumulative fact

20   witnesses.  The Court is concerned about too many fact

21   witnesses testifying concerning an observation of how

22   plaintiff's injuries and experience in the derailment

23   affected her emotionally, psychologically and otherwise.

24   Generally, a couple of family members and close friends is

25   sufficient unless it appears that such witnesses' testimony

1   is being attacked by Amtrak.  There would then be deemed a

2   need to corroborate with additional witnesses.  Plaintiff

3   intends to call Kyle Steel.  We have already talked about

4   this case.  Of course, she may testify.

5        Amtrak correctly referenced rule -- Local Rule 43(j) that

6   without Court approval, there should only be one expert on a

7   particular subject.  Amtrak indicates it is unclear in what

8   ways the treating mental health provider will speak on

9   separate subjects and to what extent they might be

10  cumulative.

11       Response by plaintiff is not completely clear to me, so I

12  would ask counsel if you could explain to me who your

13  treatment providers are, psychological, the mental health

14  providers, and how they -- each are different and needed.

15            MR. LEVY:  Of course, Your Honor.

16            MR. PETRU:  Scott, do you want me to do it?

17            MR. LEVY:  I think I can do it.  Sorry it wasn't more

18  clear in the papers.

19       The first mental health treater the plaintiff saw was

20  Willow Meyers.  The plaintiff saw Willow Meyers right after

21  the incident in 2018, January of 2018.  She diagnosed the

22  plaintiff with PTSD after a long assessment.  Willow Meyers

23  is the person we talked about earlier.  She's going to be put

24  on by deposition transcript.

25       The next mental health care provider is somebody named

1   Phil Burns.  The plaintiff saw Phil Burns in 2019 for about

2   ten visits.  He continued to notice the impact of the trauma

3   on the plaintiff.  What is important about his testimony is

4   that it comes a year and a half after the incident.  It shows

5   the plaintiff is still suffering from these symptoms.

6       The last mental health care provider the plaintiff intends

7   to call is Mr. Mark Barone.  Mark Barone is the current

8   treating provider for plaintiff.  Mr. Barone has diagnosed

9   Hana Haque with a general anxiety disorder.  He believes many

10  of her symptoms are directly related to the train accident.

11  Plaintiff began seeing Mr. Barone in 2021.

12      There is no overlap as far as the time frame.  The first

13  treater diagnosed her with PTSD.  There was a treater in the

14  middle who treated her in college.  Now she is seeing

15  Mr. Barone, who diagnosed her with a general anxiety

16  disorder.

17          THE COURT:  That's a sufficient explanation for the

18  Court because they are sequential health care providers, not

19  technical experts, which the rule is really addressed to.  I

20  don't have a concern about those three.

21          MR. LEVY:  Thank you, Your Honor.

22          THE COURT:  The last was to exclude all unpaid

23  medical expenses.  We have already talked about that subject.

24  That completes the Court's ruling on motions in limine.

25      Jury selection, there will be eight jurors selected.  I

1  have had some suggestion internally here about whether jury

2  selection should be done through Zoom or in person.  As of

3  right now, I believe in-person jury selection is certainly

4  workable and doable.  We will have the prospective number of

5  jurors, around 24 -- Gretchen, is that about right?

6          THE CLERK:  26.

7          THE COURT:  We can have them distanced, socially

8  distanced, and they'll be wearing masks, again, until they

9  are spoken to and then they can remove the mask when

10 responding.

11    Let me just ask the parties to comment on the Court's plan

12 to do the jury selection in person.

13          MR. LEVY:  Plaintiff agrees with Your Honor's plan.

14          MR. YATES:  As does defendant.

15          THE COURT:  All right.  I might add my colleagues

16 have done jury selection through Zoom and they speak of it

17 highly saying you can actually see straight on a juror and in

18 some respects they think it is preferable.  I am just enough

19 old school to believe that it is going to operate better, we

20 have a better jury selection process and voir dire if they

21 are here in court and not at home sitting in their bedroom

22 responding.

23    The jury selection process will begin with, I put a chart

24 in the front of the courtroom here that asks the jurors to

25 introduce themselves to each other and to us, asks them about

1    where they live, occupation, family, hobbies and interests.

2        After they do that, then I will conduct voir dire.  I will

3    go through the questions you have been provided, the

4    questions that I will be asking, and when I have completed my

5    questions, I am going to give 20 minutes to each side to

6    conduct voir dire.

7        I looked at the proposed voir dire questions.  With

8    respect to the plaintiff's, there are two that I don't want

9    the plaintiff to pursue.  One is No. 5, does anyone have any

10   concerns that plaintiff only has to prove her damages by a

11   preponderance of evidence?  They won't yet have been given

12   the instruction on what a preponderance of evidence is.  I

13   can see this leading into questions coming back.  I don't

14   think it is a significant area of concern.

15       The other one is No. 15, do you feel emotional or

16   psychological injuries are as important as physical injuries?

17   I don't know how I would answer that question.  In one

18   manner, the emotional, psychological injuries are just as

19   important.  In some cases, they are more important.  I

20   just -- I don't want the inference drawn in any way one way

21   or the other there.  I know what you are trying to drive at.

22             MR. PETRU:  Your Honor, this is Anthony Petru.  I

23   understand the Court's concern.  However, part of our task

24   here is to weed out those potential jurors who don't believe

25   that emotional injuries or emotional distress are worthy of

 1   the same compensation as physical pain.  Some people just

 2   don't believe it.  How are we going to find that out if we

 3   can't ask the question?  I would certainly prefer the Court

 4   ask those questions.

 5          THE COURT:  I think the way you phrased it was better

 6   than the way it is in the question here.

 7          MR. PETRU:  I am happy to do that.  I am happy to do

 8   that during my precious 20 minutes.  I find sometimes, I

 9   don't know, this is a case of emotional distress.  There is a

10   physical injury that is relatively minor in the big picture,

11   elbow injury, hit in the head and a cut.  The biggest part

12   here is the emotional trauma she suffered and the PTSD and

13   anxiety she carries forward.  I want to make sure the jurors

14   understand, as the law understands, that those are equally

15   compensable to physical pain based on the evidence.

16          THE COURT:  All right.  I think you can phrase it in

17   a way I am going to be satisfied with.  I don't want them to

18   be left that they are the same, because they can be

19   different.

20          MR. PETRU:  They are different.

21          THE COURT:  Yeah.  All right.  With respect to

22   Amtrak's No. 27, how would you generally characterize the

23   frequency with which you have used the health care industry,

24   including doctors, hospitals and other providers?  I think

25   that is too invasive or potentially offensive.  I don't think

```
1    it is very probative, frankly.  That one, I would ask you not
2    to ask of the jurors.
3              MR. PETRU:  What number is that?
4              THE COURT:  No. 27.
5              MR. PETRU:  Thank you.
6              THE COURT:  So then after you have completed your
7    voir dire process, then we will take up the excusal for
8    cause, challenge for cause.  I am pretty generous on excusing
9    for cause where there are hardships.  We try to screen for
10   hardships before they come into the courtroom for the
11   selection process.  I inevitably find somebody has a parent
12   at home they are taking care of, some young child, they have
13   a trip planned of some kind.  I will encourage excusing them
14   for cause.
15       After taking up those, we will do the peremptory
16   challenges, that will be three for each side.  We will have
17   eight jurors. You may end up striking the same jurors because
18   I am going to ask you to make your strikes, once you complete
19   the process, share with opposing counsel.  As I said, you may
20   end up finding you have stricken one or more common jurors.
21   Then I will ask you -- I'll have the jury composition in
22   front of me and I'll ask if this is the jury you have
23   selected.
24       Any questions about jury selection?
25              MR. PETRU:  Just to be clear, the strikes, once we
```

1  have the jury whittled down for any rulings the Court makes

2  on cause, they would be to the first -- I guess it would be

3  the first 14 jurors, first eight would be who survived out of

4  the 14.

5          THE COURT:  That is correct.

6          MR. PETRU:  Okay.  Sometimes I just want to say it to

7  make sure.

8          THE COURT:  I have also had distributed to you the

9  preliminary jury instructions, which are standard model

10 instructions from the circuit.  No. 2 is the Court employed

11 the parties' statement of the case there.  Any comments about

12 preliminary jury instructions?

13         MR. LEVY:  No, Your Honor.

14         MR. YATES:  No, Your Honor.

15         THE COURT:  I have also talked about the importance

16 of, on the eve of each trial day, for the party who is

17 currently presenting to give to the other side a list of

18 witnesses and documents that they expect the witnesses to

19 testify to.

20     The trial day begins at 9:00 and ends at 4:30 with a noon

21 recess between 12:00 and 1:30.  15-minute recess in the

22 mid-morning and mid-afternoon.  Mid-morning is usually around

23 10:30.  The afternoon, typically around three.  I will move

24 that sometimes a little bit in order to complete a witness or

25 for other reasons.

1    If there is an objection that I think needs to be taken up

2  outside the presence of the jury, I may do that when the

3  objection is raised or I may defer until the next recess, if

4  it can be handled better that way.  I don't do sidebars.  If

5  we are going to take up an objection outside the presence of

6  the jury, they will be excused.  We will not be using the

7  jury room to ex -- when they are excused, we are going to use

8  the adjacent courtroom where there is more space available,

9  healthier situation there.

10    I think that covers what I wanted to talk about.  Any

11  questions or concerns?

12         MR. LEVY:  No concerns --

13         MR. PETRU:  Your Honor --

14         THE COURT:  Yes.

15         MR. PETRU:  Sorry, Scott.  Your Honor, based on your

16  experience, would we expect we would have the jury selected,

17  opening statements and have one or two witnesses ready the

18  first day?  That is always a hard thing for plaintiff to

19  gauge, particularly when you have people that are

20  professionals.

21         THE COURT:  Typically I -- in this case, I think I

22  may end up, let's see, this begins on the 28th?

23         MR. PETRU:  Right.

24         THE COURT:  I think we are going to probably have to

25  start at 1:30, so we will only have jury selection.  The

 1  reason that is it appears to me, though it has not been

 2  confirmed, I expect it to be confirmed, I am sitting on a

 3  three-judge panel for the circuit in which I will be

 4  participating by Zoom.  That is in the morning hours.  We

 5  will hear oral argument and there will be conferencing.  I

 6  meant to mention this possibility, not only possibility, it

 7  appears to be a probability as of right now, I would say plan

 8  on beginning not at 1:30 but at 1:00 for jury selection.

 9          MR. PETRU:  We will have witnesses on Tuesday.

10          THE COURT:  I think it would be unlikely we will get

11  opening statements, but that would be good.  But I don't

12  think we will get to witnesses.

13          MR. PETRU:  Thank you for the heads up.  We have some

14  scrambling to do.

15          THE COURT:  Thank you for reminding me.  I meant to

16  mention that at the outset.

17          MR. LEVY:  I have a couple additional things I would

18  like to raise.  The first one is Dr. Hansen, who is over in

19  Bellingham at WWU health center.  He treated the plaintiff

20  after the accident, diagnosed her with a concussion.  He's

21  made the request he testify by video.  I have raised this

22  with Amtrak.  I am not sure of their position on it yet.  I

23  did want to raise it with the Court.  Dr. Hansen has told me

24  he is concerned about COVID.  That is primarily the reason he

25  prefers to testify by video.

1          THE COURT:  I expect the parties to work out

2    testimony by video.  I think it works reasonably well, not

3    withstanding my other statements about jury selection.  We

4    have a large screen here.  Each of the jurors have their own

5    individual screens they can view.  I would encourage Amtrak

6    to agree.

7          MR. YATES:  We are in agreement with respect to that,

8    Your Honor.  We may have a discussion, I'll have it

9    separately with Mr. Levy about our cumulative motion on

10   treaters.

11         THE COURT:  Okay.

12         MR. YATES: I will talk to him about that.

13         THE COURT:  You had a couple matters.

14         MR. LEVY:  Yes.  Your Honor, I also have some

15   additional motions in limine that did not make their way into

16   the writing I can address with you now or --

17         THE COURT:  Why didn't they?

18         MR. LEVY:  Some of them just came about after.  Some

19   of them we didn't think about until after we talked to the

20   witness.

21         THE COURT:  Let's hear them.  As I said, it is better

22   to know these things in advance of trial.  If Amtrak needs

23   some time to respond in writing, we can do that.

24         MR. LEVY:  Appreciate it, Your Honor.  The first one

25   is Jocelyn Doherty, who is a lay witness.  Jocelyn lived with

1　Hana before and after the accident.  She has an employment

2　history that includes working at a gentlemen's club as a

3　dancer and a web cam model.  I think it is just not relevant,

4　her employment history here, and potentially pretty

5　prejudicial.

6　　　　THE COURT:  She's going to testify concerning what?

7　　　　MR. LEVY:  She's going to testify to the changes she

8　has seen in Hana.  She's essentially an adopted sister of

9　Hana's.  She's seen significant changes in Hana's personality

10　and behavior since the accident.

11　　　　THE COURT:  You heard what I was saying about lay

12　witnesses.  There is going to be some limitation on those.  I

13　don't want to see a redundancy, unless Amtrak is challenging

14　in substance the -- what is being testified to regarding

15　their observations of the plaintiff.

16　　　　MR. LEVY:  Understood.

17　　　　MR. PETRU:  This is Anthony Petru.  We are very aware

18　of the issue with potential redundancy.  In terms of friends

19　and acquaintances, Jocelyn is the only friend or acquaintance

20　who is a before-and-after witness outside of Hana's parents.

21　That is essentially it for lay witnesses.  Kyle, who was the

22　woman who saw her on the hill, will testify with regard to

23　her observation, but she certainly isn't a before and after,

24　just an after.

25　　　　THE COURT:  That sounds fine.  Mr. Yates, do you want

1    to respond to this?  Sounds like to me that would be not

2    relevant, and even if marginally relevant, only to embarrass

3    the witness.

4         MR. YATES:  Right.  Your Honor, I am inclined to

5    agree.  We would have liked to have been able to evaluate the

6    motion to respond in writing.  I don't think it is going to

7    present an issue.  I will confirm that with the rest of our

8    team.  I don't anticipate that being an issue at trial.

9         THE COURT:  All right.

10        MR. LEVY:  The last one is there is several

11   references in the medical records to plaintiff using

12   cannibis; we would like to keep that out as well.  There is

13   also a reference in the academic transcripts that defendant

14   has on their exhibit list, an incident in college where an RA

15   came by and the plaintiff was smoking or somebody in the

16   plaintiff's room was smoking a joint.  There was some

17   discipline for that.  That episode, I think, has no bearing

18   here and any reference to her drug use, which is totally

19   normal for a kid her age, we think that should all be

20   excluded.

21        THE COURT:  You have said two different things,

22   marijuana and drug use.

23        MR. LEVY:  By drug use, I meant marijuana.

24        THE COURT:  Mr. Yates.

25        MR. YATES:  I actually believe there was some

1    Adderall or Ritalin use.  I will have to check the records on

2    that.

3         What I would say, Your Honor, what I -- I think our

4    position is going to have to depend on the plaintiff's

5    testimony a little bit.  What I anticipate is there will be

6    testimony that after this incident, there was some problems

7    with school and a disruption in that.

8         If that's the case, we may want to explore other reasons

9    why there was disruption in her academic engagement.

10        Again, I will talk to our team about that and Mr. Levy and

11   try to work something out.  This one is more nuanced based on

12   what I expect the plaintiff's testimony to be.

13             THE COURT:  All right.

14        Any opportunity to settle this?  I assume you have had

15   settlement discussions.

16             MR. YATES:  We have.  We, in fact, are having another

17   mediation on Saturday.

18             THE COURT:  All right.  Well, it will allow the Court

19   to take, then, the next trial that I have, which right now I

20   am having to tell them that this case is going to probably

21   bump them.  As soon as you have word, you will, of course,

22   let us know.

23             MR. YATES:  We will, Your Honor.

24             MR. PETRU:  Of course.

25             THE COURT:  Thank you.  We'll be in recess.

1    (Recessed.)

1                    C E R T I F I C A T E

2

3

4        I certify that the foregoing is a correct transcript from

5    the record of proceedings in the above-entitled matter.

6

7

8

9    /s/ Angela Nicolavo

10   ANGELA NICOLAVO
     COURT REPORTER

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25